# Brown's Appeal.

1. A step-father is under no legal obligation to support a step-child after the death of its mother. If the child resides in his family and he maintains, clothes and educates it, he is not entitled to compensation, without proof of an express contract to pay therefor; but if the guardian of the child, in good faith, and under the advice of counsel, contracts with the step-father, who is unable to support the child, to pay him for its support, the amount received by him from the United States as a pension for the support of the child, in this case $1.35 per week, he is not guilty of mismanagement of the trust, and upon his filing his account, he will not be surcharged with the amount so paid the step-father.

February 4th, 1886.    Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

APPEAL from the Orphans' Court of *Crawford county:* Of January Term, 1886, No. 274.

This was an appeal by James Brown, from the decree of the Orphans' Court, confirming the auditor's report, surcharging him in his account as guardian of Ida and Jesse Beard, minor children of A. P. Beard, deceased.

The following facts were found by the Auditor, J. W. Smith, Esq.:

A. P. Beard, the father of the wards, died May 6th, 1864. James Brown, the accountant, was appointed guardian February 21st, 1865. He received from Theron Beard, the administrator, the sum of thirty-two dollars, and from the United States pension office, from December 2d, 1867, to March 17th, 1876, the sum of $1,307.28.

The law gave to the widow, and after her re-marriage to the minor children, $8 per month, and $2 per month additional for each child under the age of sixteen. The pension ceased when the wards arrived at the age of sixteen years.

Ida Beard was born December 28th, 1856, and reached the age of sixteen December 28th, 1872. Jesse Beard was born May 9th, 1860, and reached the age of sixteen May 9th, 1876. Jane P. Beard, the mother of the wards, was married to H. C. Hammond April 14th, 1866, and died September 1st, 1868.

The account of Theron Beard, the administrator, shows that the $32 was all that he paid the guardian, the balance of the estate, which was small, having been paid over to the

widow, and any claim on this account is understood to be abandoned by exceptants. The family was left by the death of A. P. Beard in straitened circumstances, the inventory amounting to a little over five hundred dollars, and the real estate being only ten acres, of which about three acres were cleared, and the balance covered with logs, brush and stumps. On this there was a small board house and small barn. The family lived here for a year after the marriage of Mrs. Beard to Mr. Hammond, when they moved on to a farm of 42½ acres, which Mr. Hammond and his two brothers bought, and on which they paid $300 hand money.

The three brothers worked this farm, and their father's farm, as tenants or croppers, under their mother, in partnership for six or seven years, when they sold it, and Mr. Hammond moved on to another farm. In the meantime they built a house on the place, and when it was sold there was either $1,100 or $1,300 apiece realized.

The guardian made the contract with the mother, before the pension was received, that she should have it for the support of the children.

He did this by the advice of the late Judge Derickson.

After her death he made the same bargain with the step-father, with the addition that he was to have the use of the ten acres for fencing, clearing, paying taxes, etc.

The children lived with their mother until she died, and with Mr. Hammond afterwards—Ida, until she was 18 years old, and Jesse until he was nearly 16 years old, when E. E. Holmes was appointed his guardian.

The children were kept and clothed as farmers' children usually were, and went to school summer and winter, whenever there was school. They did such chores and housework as children of their ages can do. The witnesses give Ida credit for being an exceptionally good girl to work.

The testimony shows that the new fence and the clearing of the land was worth as much as the rent would amount to during the time Mr. Hammond had the use of it. The only question arising on these facts for the decision of the Auditor is whether this agreement to pay, and the payment of the whole of the pension for the support of the wards, was reasonable.

At the most it was $1.50 per week for each ward. Several witnesses testify that they think Ida earned her board and clothing by her work. Several witnesses testify that the board and clothing of such children at that time was worth $3 per week each, and that the labor of the older one, when not in school, was worth $1.50 per week. The guardian testifies that he could not have hired the children kept elsewhere for the

pension. Mrs. Brown, an aunt of the wards, testifies that she proposed on the death of Mrs. Hammond, to take the children and keep them. This offer was made to Hammond, and there is no evidence that it was communicated to the guardian. Mrs. Brown, then Mrs. Craven, had no children of her own, and made the offer out of affection for the children of her deceased brother.

Under all the facts in this case, the Auditor does not think the payments so clearly unreasonable, that the accountant should be surcharged.

There is no evidence of bad faith on his part. There is no doubt but that he paid over the money as fast as he received it, and he has accounted for every dollar that came into his hands.

The Auditor thinks that such a trustee, who has acted in good faith and on the advice of reputable counsel, should not be surcharged for a mistake in judgment, as to what was a reasonable allowance for the support of his wards, except on clear and satisfactory evidence that the payments were grossly excessive. The Auditor is of the opinion that the evidence in this case is not sufficient to justify a finding either of fraud or of that gross negligence in the management of the estate which would authorize a surcharge against the accountant.

The Auditor therefore recommends that the exceptions be dismissed and the account confirmed.

Exceptions were filed to this report, which were sustained.

The court, CHURCH, J., filed the following opinion:

I find myself unable to agree with the conclusions of the Auditor in this case.

He reports that the case was submitted to him without argument, and this fact may have caused him to reach a conclusion different from what it might otherwise have been.

Inasmuch as the account must be referred back to the Auditor for readjustment and re-statement, (and this must be done for each ward separately and not jointly, as was heretofore done), it is necessary only that I give briefly the principles upon which the account must be stated.

When Hammond married the widow of Beard, the latter had two children by her former husband—minors of ten and eight years of age, respectively. By that act of Hammond, those minor children became the inmates of his household, as did the mother—they became members of his family. Especially ought this to be the case, when the new husband and father actually moved on to and lived upon the very farm owned by the children, left them by their own father.

A man marrying the mother of minor children takes the children along with the mother. The step-father stands as to

them *in loco parentis*. He is responsible for their maintenance and education so long as they continue to reside with him. The minor child receives shelter, food, clothing, and education, and in return gives to such parent whatever services physical and moral such child can give.

No device nor expedient can be successful, which will enable the minor child by a widowed mother to assume toward a second husband the attitude of a creditor for services rendered —or of a debtor for food and clothing: Lantz *v.* Frey, 14 State Rep., 201; Ruckman's Appeal, 61 State Rep., 253; Douglass' Appeal, 82 State Rep., 169; Duffey *v.* Duffey, 44 State Rep., 402, and cases therein cited.

These principles show good law, good morals and good common sense, and to the facts in this case are particularly applicable.

The step-father had actually gotten himself a home upon the children's land, but demanded for himself and his wife the pittance the children were entitled to receive from the government, earned by the life-blood of their own father; and we find a complaisant guardian bartering away their whole income to one who was entitled to claim it neither in law nor in morals. It is certainly true that many guardians fall far short in their duty towards their wards. They seem to have very queer conception of the sacredness of their trust. As guardians they should guard. Thus their very name is indicative of their profession, or of what it should be. Much of this shortcoming arises from ignorance rather than from a wilful disregard of their duty. The advice of a discreet and judicious counselor-at-law should be called in to inform ignorance; yet even then for palpable mistakes the law must furnish the remedy, and if a counselor gives ill-advice, it is malpractice upon the latter's part, for which he may be held responsible.

For gross negligence or misconduct on the part of a trustee, the latter cannot excuse and free himself by the shield of a lawyer's advice. The Auditor's report mentions the name of the lawyer giving this guardian the advice, that he could use up all the children's income in paying their own mother and step-father for the support that the latter should have freely bestowed upon them. I do not find the name of the lawyer in the testimony, but he no doubt was named to the Auditor. Whoever it might be that gave this guardian this advice, it was very poor and worthless counsel, and cannot here be used as a cloak to cover up the gross negligence of this guardian.

If the guardian were permitted to contract for the support of his wards at all, and he certainly could except with the mother and step-father, he must make a reasonable contract.

Under the evidence in this case, even if we view the step-father as a stranger, the sum the guardian agreed to pay for the support of the children was most extravagant. The oldest child (the daughter) at least earned her own living. She worked for her step-father as if for her own father, and certainly earned her own board, lodging and clothing. Her education was free. The boy soon began to earn the same board, lodging and clothing for himself.

The $3 per week received by this step-father, together with the work of the children, to say nothing of the use of the children's land, undoubtedly kept the whole family; and this especially after the death of the mother of the children.

In view, therefore, of the evidence as to the relationship of the parties, the services rendered by the children, and the surrounding circumstances of the case generally, together with the law on the subject, I am irresistibly drawn to the conclusion: First, that the step-father was bound to keep these step-children without any other reward or recompense than their services and labor rendered to him; second, that the guardian exceeded his power and authority in making the contract with the step-father as set up in his account; third, that even if the first two propositions are not true, the actual contract made by the guardian was a most unreasonable and improvident one; and the sum he agreed to pay for his wards' support was most extravagant, and a wanton waste of his wards' money.

Inasmuch as the money alleged to have been wasted came from the Federal Government in the form of pension, I am unable to state how much of the amount the guardian received belonged to the mother. I believe that which was received by the guardian after the mother's re-marriage belonged to the children exclusively. This will have to be separated from that which by law belonged to the children and widow mother.

The latter, *i. e.*, that received by mother and children before her marriage, if any there was, was probably rightfully paid out by the guardian. The former, *i. e.*, that which belonged to the children, exclusive of the mother, must be accounted for by the guardian according to the principles laid down in this opinion. And the whole matter is referred back to the Auditor to re-examine the case, and re-state an account of this accountant as guardian of each ward separately. The re-statement to be made on notice to the parties interested, or their attorneys, and according to the principles herein enunciated.

The matter of the rent of the children's farm was substantially withdrawn by exceptants in the argument, and I have

not adverted to it.   It may be renewed if it seem good to the exceptants so to do.

The several exceptions filed on behalf of the wards are sustained in so far as they are met by this adjudication; and the report and all matters connected therewith are. referred back to the Auditor to proceed as herein directed.

The Auditor re-stated the account in conformity with the opinion of the court.   The guardian filed exceptions to this which were dismissed and the report confirmed.   To this decree this appeal was taken by the guardian, assigning for error the decree confirming the report of the Auditor.

*W. R. Bole* (*A. J. Harper* with him), for appellant.—There is no case in Pennsylvania holding that a step-father is legally bound to support his step-child.   In Duffey *v.* Duffey, 8 Wr., 402, READ, J., says: "In Pelly *v.* Rawlins, Peake's Add. Cas., 226, it was held that if a husband educate a wife's child by a former husband, he cannot recover compensation from such child when it comes of age."   This case is cited in Chitty on Contracts by Russell, 6th ed., pp. 48, 144, and he says in such case no recovery can be had, "unless there be an express promise to repay him," which is also stated as the law in 1 Story on Contracts, § 82 f.   There was here a contract to pay.

The second question raised by these appeals is, was the step-father of sufficient ability to support these wards.   For, even if he was legally bound to support them and yet was not of sufficient ability, then the guardian was justified in making the agreement to pay for their support.

An allowance will not be made to a father for the maintenance of his minor children unless it appears that he is unable to support them: Rhone's O. C. Pr., 335; Harland's Accounts, 5 Rawle, 323.

If a mother is not able to maintain her minor child an allowance may be made for its past and future support: Pennock's Estate, 32 Legal Int., 169; Strawbridge's Appeal, 5 Wh., 568.

An order for past allowance may be made for past maintenance on the ground that the court may ratify what it would have approved: Seibert's Appeal, 7 Harris, 49.

The evidence shows that the step-father was unable to support these children.

The present inquiry is, whether he should have credit for all the payments made for the support of the wards.

All that a court of equity requires of a trustee is common skill, prudence and caution.   Especially when a trustee acts under professional advice he will be protected: Neff's Appeal, 57 St. R., 91.

Here was a stipend of less than $1.50 per week for each

ward, given by the government for their support, because that government had taken and sacrificed in her defence the life of their natural supporter. This stipend only continued as long as such minors were unable to maintain themselves and ceased at the age of sixteen.

*Humes* (*Frey* with him), for appellees.—When a step-father takes his step-child to live with him as one of his family, he is not entitled to be repaid for expenditures made for her during her minority : Douglass' Appeal, 1 Norris, 169 ; Sulz *v.* Frey, 2 Harris, 202 ; Duffey *v.* Duffey, 8 Wr., 399.

As to guardian's good faith, on which appellants so much rely, we say : If it were necessary to expend the money for the support of the children, the law points out the method of proceedings, and it was the duty of the guardian to follow the Act of Assembly. See Act of 29th of March, 1832, P. L., 192.

In Nicholson's Appeal, 8 Harris, 54, Judge BLACK, delivering the opinion, says: " Though there is nothing before us which makes it necessary to believe that the appellant is other than a most conscientious and upright man, he seems to have utterly misunderstood his duty. It matters little to an orphan child whether his interests are sacrificed and his prospects blighted by well meaning ignorance or by wilful malice. Either is within the definition of misconduct, a word which applies not to the motive but the act."

Mr. Justice PAXSON delivered the opinion of the court, April 5th, 1886.

If this decree is affirmed the appellant will have had a severe experience as a guardian, of minor children. He received in all for his two wards the sum of $1,339.28, of which $1,307.28 was pension money from the United States. All of this money was paid out by the guardian for the maintenance and education of the wards. The court below has surcharged him with the sum of $1,886.09.

It was not denied that the money had been paid out as above stated ; nor that it had been expended under a contract made by the guardian for the support of the children ; but it was alleged that the contract and the payments thereunder were improvident. Upon this point the learned judge below says : " The actual contract made by the guardian was a most unreasonable and improvident one, and the sum he agreed to pay for his wards' support was most extravagant, and a wanton waste of his wards' money."

This is strong language. The children appear to have been about eleven and eight years of age when their mother died, and they were left in the sole charge of their step-father. The

pension to which they were entitled was $12 per month until the elder child reached the age of sixteen, and $10 per month from that time until the younger child arrived at the age of sixteen, when it ceased. This pension money was applied by the guardian to the support of the children as long as it was received from the government. As near as I can come at it, the payments amounted to about $1.35 per week for the clothing and maintenance of each child.

This sum does not impress us as being extravagant. Circumstances, however, may make it so. A brief statement of the facts is therefore necessary to a proper understanding of the case. A. P. Beard, the father, died in the army on May 6th, 1864, leaving a widow and two children, Ida and Jesse, the minors in question, aged seven and four years respectively. James Brown, the appellant, was appointed their guardian February 21st, 1865. The mother of the minors was married to one H. C. Hammond April 14th, 1866, and died September 1st, 1868. It was not denied that the death of Mr. Beard left the family in very destitute circumstances. They had a lot of about ten acres of land, three acres of which were tillable, the rest covered with stumps, logs and bushes, and practically without fences. The improvements were of little value; very small, very poor, and very much out of repair. The guardian, acting under the advice of counsel, paid the pension money over to the mother for their support, as fast as it was received, taking therefor the receipts of the wife and her second husband. When their mother died, the guardian made a similar arrangement with the step-father, and paid the money over to him. In addition the guardian allowed him to occupy the land and house rent free upon condition of fencing the land and putting the property in repair. The latter appears to have been done. The land in its improved condition, with fences put up and the logs and stumps removed, was worth from $12 to $20 per year. The children appear to have had a comfortable home; were suitably clothed, and were sent to school whenever the schools were open. When not at school, they did such chores about the place as children of their age are accustomed to do in country places.

It was urged that the step-father could not charge for their support for two reasons, viz: 1st. He stood in *loco parentis* to the children, and 2d. That they earned their support while with him.

It is conceded that if there had been no contract between the step-father and the guardian the step-father would not have been entitled to compensation. The law in such a case, under all the authorities, would not imply a contract or a promise to pay. But there was a special contract. Was it so

improvident that the guardian must be surcharged with all the money he paid under it with interest thereon? We think not. The step-father was under no legal obligation to support these children after their mother's death. He could have sent them away and thrown them upon their guardian for support. He testifies that he was unable to support them without the pension money. The guardian may have thought that in keeping them in a comfortable home, where they would be kindly treated, properly clothed and educated, for the small sum he paid, he was making a good bargain. At any rate he made it, and made it in good faith, and we are not prepared to say it " was most extravagant and a wanton waste of his wards' money."

We·are not unmindful of the testimony in regard to the services of the children. The learned court and Auditor differ widely upon this point. The Auditor finds: " The children were kept and clothed as farmers' children usually were, and went to school summer and winter, whenever there was school. They did such chores and housework as children of their ages can do. The witnesses give Ida credit for being an exceptionably good girl to work."

The learned judge took·a radically different view of it. He says: " The oldest child (the daughter) at least earned her own living. She worked for her step-father as if for her own father, and certainly earned her own board, lodging and clothing. Her education was free. The boy soon began to earn the same board, lodging and clothing for himself."

I have examined the evidence with some care, and am inclined to the Auditor's view of it. It must not be forgotten that for a considerable portion of the time the cost of clothing, and in fact all the necessaries of life was exceptionally dear. And we must take the opinions of persons who were not members of the household as to the value of the children's services with some grains of allowance. They might be worth more to some persons than to others. In a household where their services were actually needed they would be worth more than to a poor family who could dispense with such services. What might be an accommodation to some persons might be a burden to others. I apprehend few families in humble circumstances would be willing to take such children, feed them, clothe them and send them to school whenever the schools were open, for such services as such children would render.

We do not think this guardian has so grossly mismanaged this trust as to incur the severe punishment inflicted upon him by the court below. He has acted according to his best light, under the advice of counsel, and in good faith. The fact that·an·aunt of the children offered to take them from

[Anspach and Stanton's Appeal.]

the step-father and support them, was not communicated to the guardian.   That the latter might have saved some money for the children by binding them out as servants, is possible. He did not do so;  he preferred to keep them in their home, where they would have a better chance to receive some education, and we are not prepared to say that in applying the money to their support which the government gave for that purpose he was misappropriating it.

The decree is reversed at the cost of the appellees;  the exceptions are sustained;  the first report of the Auditor is affirmed.